UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:09CR 182 SNLJ |
| ) | |
| MARTY ALLEN SHRIVER, ) | |
| ) | |
| Defendant(s). ) | |

**REPORT AND RECOMMENDATION**

Defendant alleges in Defendant's Motion to Suppress Statements that any incriminating statement made by him was the product of coercion and was not voluntary. Defendant states he was questioned at 9:00 A.M. on November 5, 2009, again at noon and a third time in the middle of the afternoon. After being in custody for six hours, Shriver made a written statement.

The defendant says he advised his questioners that he had been up all night and had used a controlled substance. He says the interrogators knew that Mr. Shriver had extremely limited mental abilities and reading comprehension limitations.

He states further that any waiver of his right to remain silent made by him was neither knowingly made nor was any such waiver voluntary within the meaning of Miranda v. Arizona.

In Defendant's Post-Hearing Memorandum in Support of Motion to Suppress, Mr. Shriver urges that he was arrested and held without probable cause.

In Defendant's Second Post-Hearing Memorandum, Mr. Shriver continued to argue that he was arrested and held without probable cause.

**Factual Background**

On November 5, 2009, the Wayne County Sheriff's dispatcher, Donald Robinson, received a telephone call at around 5:45 A.M. The call was placed to the Piedmont Police Department but was forwarded to the Wayne County Sheriff's Office. The sheriff's office handled the duties of dispatching assistance for calls to the city's police force. The caller would not give his last name but said his name was "Marty." Marty said that he had placed several bombs inside and around the Windsor Food building. Marty stated that he had placed those bombs there because the Windsor Food Company would not hire him. The caller said he was leaving town immediately. The Windsor Food Company is a food processing plant in Piedmont, Missouri. Other officers were notified and the Windsor Food building was searched. No bombs were found on the premises. The officers discovered that the phone call was placed at a pay phone at the L & L Minit Mart in Piedmont, Missouri. That was the number that appeared on the caller ID feature of the phone of the officer receiving the call.

The Piedmont police chief, Richard Sanders, made contact with Missouri Probation and Parole Officer Pamela Morris, according to her testimony. Sanders asked Morris to make contact with Marty Shriver and to have Shriver come to the Piedmont police Station. Shriver was a person on state parole supervision who was being supervised by Morris. Shriver lived with a female in a nearby area known locally as Lick Branch. Morris went to the Shriver home at around 7:00 A.M. and knocked on the door. Shriver came to the door fully dressed. Morris told Shriver to report to her office immediately. Morris's probation office is in the same building as the Piedmont Police Department. Morris had no further contact with Shriver that day.

Sanders had been a witness to part of a meeting between Morris and Shriver a few weeks

prior to the bomb threat. That meeting occurred at Morris's office in the police station building. Sanders heard a loud voice coming from Morris's office. Sanders stepped into that office and heard a discussion between Morris and Shriver concerning Morris's parole requirement that he maintain employment. At that time, Shriver was unemployed. Shriver replied that he couldn't get hired at Windsor Foods. Shriver was angry and cursing during this conversation, during which Shriver stated that he might as well go back to prison.

Sanders also knew where Shriver lived, which was on Lick Creek Road, about a mile or mile and a half from the L & L Minit Mart in Piedmont. Sanders knew that there was a footpath between Shriver's home and L & L Minit Mart that went through some railroad property. Sanders also knew that Shriver did not have a vehicle, nor drive, and that Shriver normally walked wherever he needed to go. Sanders had also seen Shriver walking this particular path on other occasions.

Sanders knew of only one other person in Piedmont who had the first name of Marty and that person was working in St. Louis at the time of the threat. Sanders had lived most of his life in Piedmont, a city of about 1,800 people. Sanders had known Shriver for more than ten years and was familiar with him.

Morris had supervised Shriver on her parole caseload since May 18, 2009. She had explained the rules of supervision to Shriver by reading the terms of that supervision to him. Shriver appeared to understand the terms of his supervision. Shriver was argumentative at times, but there was never an occasion when Shriver did not understand the terms of his parole. During 2009, Shriver worked at the Windsor Food Plant in Piedmont three separate times.

Shriver appeared at the Piedmont police station shortly after 8:00 A.M., where he was met by Piedmont police officers. He was given a <u>Miranda</u> warning by Officer Pratt at 9:30 A.M. Shriver

made a written statement to Pratt after receiving that warning in which he denied making any bomb threat and provided a statement that he was home all night the night before the bomb threat until contacted by Officer Morris. Shriver made a verbal statement to Pratt that he didn't think he made the bomb threat. Shriver also told Pratt that he had been using methamphetamine. The officer obtained a urine sample from Shriver. That sample was positive for the presence of methamphetamine. Shriver was then placed in the city's jail pending investigation. The investigation continued, with the officers finding out that Shriver's alibi was contradicted by Shriver's girlfriend, Jackie Smith. Smith told the officers that Shriver was not at his residence when the bomb threat call was made. Officer Hicks spoke again with Shriver later that same morning. Again, Shriver was given a Miranda warning. Shriver did not make any incriminating statements during that interview.

At 2:52 P.M., Officer Cory Thompson spoke again with Shriver. Thompson gave Shriver another Miranda warning. Shriver agreed to speak with the officer. Shriver asked when he would be going home. Thompson told Shriver that Shriver would be going home at the conclusion of the interview. Thompson did not believe that Shriver was under the influence of any narcotic when Shriver was speaking with Thompson. Thompson was familiar with Shriver, having talked to Shriver several times, including a time when Shriver was under the influence of narcotics. During this interview, Shriver admitted that he was the person who had called in the bomb threat. Shriver wrote out a statement to that effect for Thompson.

Thompson had conducted another investigation where he attempted to interview Shriver. That case involved a burglary at Shriver's mother's residence. Thompson had found evidence of a shoe print on the entry door for the burglary and had found a pair of Shriver's shoes which appeared to match the shoe print on the door. Thompson brought Shriver to the police Station and gave him

a <u>Miranda</u> warning. Initially, Shriver spoke with Thompson and made a brief statement. When Thompson began asking questions about Shriver's shoes, Shriver elected to exercise his right not to talk to the officer. Shriver stated that he did not want to speak to the officers any more. The interview was terminated at that time due to Shriver's request.

On May 31, 1998, Shriver was evaluated by the Arcadia Valley Public School District. That evaluation found that Shriver had an Intelligence Quotient between 62 and 65 and was considered to be mildly retarded and that he needed special services in order to complete his educational requirements.

## Discussion

## Probable Cause

The court will first take up the question of probable cause.

Probable cause to obtain an arrest warrant or to conduct a warrantless arrest exists when police have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information and sufficient in itself to warrant a belief by a prudent person that an offense has been or is being committed by the suspect. <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964); <u>also</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 479 (1963) (it is basic that an arrest ... must stand upon firmer ground than mere suspicion).

Police may use their experience, special training and expertise to draw limited inferences of criminal activity from behavior that is not facially criminal. <u>Texas v. Brown</u>, 460 U.S. 730, 742-43 (1983); <u>United States v. Valle Cruz</u>, 452 F.3d 698, 703-04 (8th Cir. 2006).

The Eighth Circuit, in <u>United States v. Jones</u>, 535 F.3d 886, 890 (8th Cir. 2008), explained, "A 'probability or substantial chance of criminal activity, rather than an actual showing of criminal

activity' is sufficient," citing United States v. Torres-Lona, 491 F.3d 750, 755 (8th Cir. 2007).

Under the reasoning in Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795 (2003), the court is to examine the events leading up to the arrest and then decide whether these historical facts viewed from the standpoint of an objectively reasonable police officer amount to probable cause to arrest an individual.

Chief Richard Sanders of the Piedmont Police Department testified about what he was told when he came into the department on November 5, 2009:

> Received from my sergeant that there was at (sic) call came into the Wayne County Sheriff's Department that morning about 5:45 a.m. that they was bombs set around the Windsor Food Industrial Park area and that he had been trying to get a job there and he – he had done it and his name was – he had done it and his name was Marty and he would not give his last name.

(Tr. II, 5).[1]

The chief testified there were about 1,800 people in Piedmont, Missouri. (Tr. II, 5). He explained that "... we live in a small community and I know about everybody there...." Asked if he knew anyone named Marty, Chief Sanders stated that he knew two Marty's in Piedmont. (Tr. II, 6). Besides Marty Shriver, there is another, Marty Penz. The chief explained that Marty Penz owns a couple of businesses in Piedmont and works out of the St. Louis area. The other Marty was Marty Shriver. The chief explained, "... what really got to us looking towards him as a suspect is couple weeks prior, a few weeks prior to this incident, he was in the probation offices and he was getting kind of loud so I walked in there with her which is in the same office building – ...." (Tr. II, 7-8). He explained that the "her" in his comment was Probation Officer Pam Morris. He stated further,

---

[1] There were two evidentiary hearings on the Defendant's Motion to Suppress. The transcript of the first hearing held on March 8, 2010, will be designated by I and the transcript of the second hearing held on May 6, 2010, will be designated by II.

- 6 -

"I walked into that office and sat there with her and Marty Shriver was in there and he was upset because Windsor Food would not hire him or Pro Staff would not put him back on the hiring list. He was very aggravated about it." (Tr. II, 8). The chief stated that Mr. Shriver cursed a few times and said that he might as well give up "and don't look like he can get a job there and he was very mad about it." Id.

The chief continued, "He was upset because the probation officer requires them to try to seek employment and evidently he wasn't going to get hired and looked like he was going to have to go back to jail is that what Mr. Shriver said." (Tr. II, 8-9). The chief continued that on the morning the bomb threat was made he was aware Mr. Shriver had been trying to get his job back.

The chief testified that Shriver lives in an area called Lick Branch, which was west of the L & L Minit Mart where the officers had learned from caller identification that the threatening phone call had been made. The chief said Mr. Shriver's home was about a mile west of the Minit Mart. (Tr. II, 10). He continued that everybody uses a path that crosses the railroad property from Lick Branch to the back of the L & L Minit Mart. The chief continued that he had seen Mr. Shriver use that foot path. When asked if he saw Mr. Shriver walking in town a fair amount before he was arrested, the chief responded, "Yes. He doesn't drive." (Tr. II, 10). The chief estimated that it would take about twenty minutes for Mr. Shriver to walk from his house to the Minit Mart. Chief Sanders testified that he was not aware of any other persons in the Piedmont or Wayne County area who would fit the description of people he knew about who would be likely suspects for making the bomb threat. (Tr. II, 11).

Chief Sanders testified that he has known Marty Shriver "pretty near most of his life that he's been in Piedmont, him and his family," which was more than ten years. (Tr. II, 7).

To recapitulate, the person who phoned in the bomb threat had admitted that his name was Marty. The caller stated that he had placed the bombs around the Windsor Food Plant and that he had been trying to get a job at Windsor Food. The hiring company, Pro Staff, would not put him on the list of persons to be considered for rehiring. Chief Sanders recalled the incident which pointed at Mr. Shriver as the caller about the bomb threat which had occurred some weeks before the actual bomb threat. The chief had had to go into the probation officer's office when Mr. Shriver had gotten loud when he was angry that he could not go to work at Windsor Food which, in turn, would keep him out of compliance with a condition of his parole. The police knew of a foot path leading from the area where Mr. Shriver lived directly to the back of the L & L Minit Mart. The pay phone at the Minit Mart was the source of the threatening phone call. Mr. Shriver did not drive and had been seen using the foot path. The walk from Mr. Shriver's home to the Minit Mart would take approximately twenty minutes.

The police chief, who was 59 years old, had known Mr. Shriver for over ten years. He knew about everybody in town, which was a small community. He knew of only two persons named Marty in Piedmont. The first was Marty Penz, a successful businessman, who owned two businesses in Piedmont and worked out of St. Louis. He was eliminated by the fact that he did not need to have a job at Windsor Food. Chief Sanders knew of no one else in Piedmont who would have been likely to make the phone call containing the bomb threat besides Marty Shriver.

The foregoing facts were provided to Chief Sanders and the other officers investigating the bomb threat. They constituted a "probability or substantial chance of criminal activity" which was sufficient to establish probable cause to arrest Mr. Shriver. <u>United States v. Torres-Lona</u>, 491 F.3d at 755. The arrest of Mr. Shriver was valid and did not violate the Fourth Amendment.

The court finds that when Mr. Shriver acceded to Probation Officer Pam Morris's direction to go to her office which was in the police department building, he was acquiescing to authority and was under arrest. United States v. Brown, 448 F.3d 239, 246-47 (3rd Cir. 2006)(seizure when defendant submitted to the officer's demand that he submit to a patdown and wait for the victim to arrive and identify him). Mr. Shriver would not have felt that he would be "free to leave" or ignore his parole officer's directive to go to the police station. Chief Sanders stated that Mr. Shriver was going to be detained at the point when he came into the police station. (Tr. II, 11).

### **Coercion and Voluntariness of Statement**

As noted at the beginning of this Report and Recommendation, Mr. Shriver alleges in his Motion to Suppress Statements that any incriminating statement made by him was the product of coercion and was not voluntary. He states he was questioned at 9:00 A.M. on November 5, 2009, again at noon and a third time in the middle of the afternoon. After being in custody for six hours, he made a written statement admitting that he made the telephone bomb threat.

"In determining whether a confession is voluntary, a court should examine the circumstances surrounding the confession, including '"the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess."' United States v. Johnson, 47 F.3d 272, 275 (8th Cir. 1995) (citing United States v. Casal, 915 F.2d 1225, 1228 (8th Cir. 1990), cert. denied." United States v. Mendoza, 85 F.3d 1347 (8th Cir. 1996).

It is true that the defendant was questioned on three occasions: at approximately 9:00 A.M., at 12:00 noon, and a third time in the middle of the afternoon. Before each of the interviews, Mr. Shriver was given the Miranda warnings, each of which he initialed in writing and acknowledged that he understood that he could exercise "these rights at any time and not answer any questions or make

statements." (Gov. Ex. 2, 3 and 4). At the bottom of Exhibit 2, the first waiver form, Mr. Shriver denied making a bomb threat, saying he was home with his girlfriend from 8:15 to 8:30 P.M. on November 4th until his probation officer, Pam Morris, came to the house and told him to be at her office [on November 5].

Officer Pratt had conducted the first interview with Mr. Shriver. Orally, Mr. Shriver "stated he did not think he had" [made a bomb threat that morning.] (Tr. II, 22). Chief Sanders recalled he had been told that Mr. Shriver "made a verbal statement to the officer that he might have made the bomb threat." (Tr. II, 12).

At the bottom of the form used for the second interview, Gov. Ex. 3, Mr. Shriver made no written statement.

Before the third interview, new information was gathered by the investigators. The officers were under the belief that Mr. Shriver had said that he was home when the bomb threat was made, but they obtained a witness's statement that he was not at home at the time the telephone call was made. The witness was Mr. Shriver's girlfriend, Jackie Smith. (Tr. I, 54).

Officer Thompson, who conducted the third interview of Mr. Shriver, read the Miranda warnings to Mr. Shriver. (Ex. 4, Tr. I, 30-31). After each of the warnings, Shriver placed his initials acknowledging that they had been read and understood. Thompson testified that he read each right to Shriver. Officer Thompson stated that Mr. Shriver seemed a little bit tired and he wanted to go home. (Ex. 4, Tr. I, 32). Thompson stated that when he removed Shriver from the holding cell, Mr. Shriver asked when he was going to be able to go home. At that point, Thompson advised him after the interview was complete, he would be going home. When asked if he made his statement in terms of his going home would depend on what he said or did Thompson make a statement in terms of he

would be just simply going home no matter what he said, Thompson answered basically that he would be going home no matter what he said. Id.

Thompson testified that Shriver did not appear to be under the influence of some narcotic or controlled substance at that time. He testified that he has spoken with Mr. Shriver more than ten times over the past eight or ten years, and Shriver seemed sober to Thompson. He has seen the defendant under the influence of chemicals previously. His appearance on that day, November 5, 2009, did not make the officer think the defendant was under the influence of narcotics. (Tr. I, 33-34). No threats or promises were made to Mr. Shriver to induce him to make a statement. Mr. Shriver was not in handcuffs. Officer Pratt, the first to interview Mr. Shriver early in the morning, told Thompson that Shriver had indicated to him that he had been using methamphetamine and had been up all night. (Tr. I, 45). Shriver did not complain to Thompson about being tired or hungry or about the temperature. He did complain about wanting to go home. The first thing Thompson did was ask "him if he was okay, if he needed anything to drink." Shriver said, "No. He said he didn't need anything to drink." At that point, Thompson filled out the top of the Miranda form and began reading Shriver his rights. (Tr. I, 47). When asked on cross-examination if he reassured Mr. Shriver each time he asked about whether he was going home, Thompson responded, "Yes. There was no doubt he was going home upon the completion of that interview regardless of the outcome." (Tr. I, 53). He added, "My superior had asked me to interview Mr. Shriver then send him home." Id.

During the third interview with Officer Thompson, Mr. Shriver admitted that he had made the threatening phone call. (Ex. 4). It is defendant's position that this statement was the product of coercion and was not voluntary.

In United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996), the Court stated, "The fact

that such [Miranda] warnings were given weighs in favor of a voluntariness finding." "Cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 2336 (2000)(quoting Berkemer v. McCarty, 468 U.S. 420, 433 n. 20, 104 S.Ct. 3138 (1984). In Missouri v. Seibert, 542 U.S. 600, 608-609, 124 S.Ct. 2601, it was the Court's opinion that "[M]aintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver," also citing Berkemer v. McCarty, 468 U.S. 420, 433 n. 20, 104 S.Ct. 3138 (1984). The last statement was quoted in United States v. Annis, 446 F.3d 852, 856 (8th Cir. 2006).

> In United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990), the Court held,
>
> The appropriate test for determining the voluntariness of a confession is "whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." United States v. Jorgensen, 871 F.2d 725, 729. The two factors that must be considered in applying the "overborne will" doctrine are "the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess." Id. (citing Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515 (1986).

The court can find no improper actions or tactics on the part of the police officers.

The defendant has not shown that his will was overborne. Officer Thompson recalled a previous experience with Mr. Shriver involving a burglary which occurred at the Shriver home. A footprint was found that appeared to match Mr. Shriver's shoe and after he was read the Miranda warnings, Mr. Shriver stated that he did not commit the burglary, but when Officer Thompson wanted to speak about Shriver's shoe, Mr. Shriver made the statement that he had nothing else to say. (Tr. I, 51, 54). Mr. Shriver knew how to exercise his right to remain silent, even seven years prior to the

November 5, 2009, incident.

The Court, in United States v. Mendoza, 85 F.3d at 1351, listed cases detailing instances where what might be considered controversial tactics were used by police officers but did not render a suspect's confession involuntary. In that case, an agent told a defendant that she would be arrested immediately if she did not cooperate. The Court concluded that this single statement was not so coercive as to deprive the person of her ability to make an unconstrained decision to confess. Then, the Court provided the following list:

> See United States v. Hocking, 860 F.2d 769, 774 (7th Cir. 1988) (FBI agents' threats that defendant faced criminal charges and imprisonment did not make defendant's confession involuntary). See also United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir.) (suggestion by law enforcement that defendant might suffer while serving long prison sentence did not make ensuing statement involuntary), cert. denied, 506 U.S. 964, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992); United States v. Nash, 910 F.2d 749, 752-53 (11th Cir. 1990) (officer's discussion of realistic penalties for cooperative and noncooperative defendants did not make defendant's confession involuntary); United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (agents' threats of long prison sentence if defendant failed to cooperate did not make statements involuntary), cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991); Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (confession voluntary even though defendant with below-average IQ was subjected to seven and one-half hour interrogation with agent who played on his emotions); Cf. Kilgore, 58 F.3d at 353 (statements voluntary despite evidence that defendant's motivation in confessing was to recover his impounded vehicle and not spend the night in jail).

In our case, the defendant alleges that his confession was not voluntary because he was held in custody for six hours, had been up all night and had used a controlled substance, methamphetamine. He argues that the interrogators knew that Mr. Shriver had extremely limited mental abilities and reading comprehension limitations.

With reference to a drug problem, in United States v. Palmer, 203 F.3d 55, 60-61 (1st Cir. 2000), the confession was held voluntary despite defendant's heroin withdrawal and anti-depressant

use because he appeared clear-headed; in United States v. Harris, 44 F.3d 1206, 1210 (3rd Cir. 1995), the confession was held voluntary despite defendant's recent consumption of forty ounces of malt liquor because the Court found no credible evidence the defendant was under the influence; in United States v. Cristobal, 293 F.3d 134, 142 (4th Cir. 2002), the confession was held voluntary because the defendant, though medicated, was alert and coherent; in United States v. Reynolds, 367 F.3d 294, 299 (5th Cir. 2004), the confession was voluntary despite defendant's lack of sleep and methamphetamine use one hour before arrest because defendant was alert and cooperative during questioning and interrogating officers saw no indication of drug influence; in United States v. Walker, 272 F.3d 407, 412-13 (7th Cir. 2001), the confession was voluntary because defendant, in physical pain from heroin withdrawal, was alert and did not claim to feel ill or ask for medical attention; in United States v. Contreras, 372 F.3d 974, 977-78 (8th Cir. 2004), the confession was found voluntary despite defendant's recent methamphetamine and marijuana use because defendant appeared sober and no police coercion was alleged.

With reference to the defendant's physical condition from having been up all night, in Pagan v. Keane, 984 F.2d 61, 63 (2nd Cir. 1993), the confession was voluntary despite the defendant's gunshot wounds and morphine treatment because the defendant was alert and not disoriented; again, in United States v. Cristobal, 293 F.3d 134, 138 (4th Cir. 2002), the confession was found voluntary despite questioning in the hospital the day after defendant had emergency surgery while he was on pain killers; in United States v. Jones, 359 F.3d 921, 923-24 (7th Cir. 2004), the confession was voluntary despite defendant's "delusional behavior, paranoia and grandiose thoughts" because there was no police coercion; in United States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004), the confession was voluntary despite the defendant's stomach ailment because there was no significant

physical or mental impairment during questioning.

With respect to the defendant's mild mental retardation, in Vance v. Bordenkircher, 692 F.2d 978, 980-81 (4th Cir. 1982), a statement was found voluntary although the fifteen-year-old defendant had low intelligence and mental age of a nine-year-old; in Gachot v. Stadler, 298 F.3d 414, 420-21 (5th Cir. 2002), a confession was held voluntary despite the mother and attorney's inability to access a fifteen-year-old defendant because he was treated with "kid gloves," had prior exposure to law enforcement personnel and was repeatedly read and understood his rights; in United States v. Male Juvenile, 280 F.3d 1008, 1022-23 (9th Cir. 2002), a confession was voluntary despite a fourteen-year-old defendant's misunderstanding of how his statements could be used because investigators did not misrepresent his rights and there was no evidence of coercion.

With reference to Mr. Shriver's intelligence, Chief Richard Sanders testified, "I think he's slow but he's not too slow to know that he does what's right and wrong." (Tr. II, 14).

The defendant is experienced with the legal system. The Pretrial Services Report given to the attorneys before the detention hearing lists ten times the defendant has been arrested, mostly for misdemeanors, but he has two felony convictions. While on parole, he was charged on four occasions with escape from the St. Louis Community Release Center.

The court finds the police used no coercion in their treatment of Mr. Shriver. The court further finds that the defendant's will was not overborne and that he knew what his rights were and knew how to exercise them as demonstrated by his exercising his right to remain silent in the burglary incident in which his shoe was possibly involved sever years previous to November 5, 2009.

**<u>Conclusion</u>**

For the foregoing reasons, the court finds:

> the defendant was validly arrested on probable cause;
>
> the defendant voluntarily and understandingly waived his Miranda rights and made statements which were voluntary and knowingly made;
>
> the defendant was not subjected to coercion by police officers of the Piedmont, Missouri, Police Department;
>
> and
>
> the defendant's statements on November 5, 2009, to police officers of the Piedmont Police Department are admissible at trial and should not be suppressed.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements (Document #21) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

*/s/ Lewis M. Blanton*
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of June, 2010.